IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

INTERNATIONAL ASSOCIATION OF :
MACHINISTS AND AEROSPACE
WORKERS :

v. : Civil Action No. DKC 2004-2552

:

BONNIE WERNER-MATSUDA, et al.
:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action
are a motion to dismiss by Defendants Bonnie Werner-Masuda and
the Union of Independent Flight Attendants ("UIFA") for lack of
subject matter jurisdiction and failure to state a claim (paper
33),[1] and a motion to dismiss for lack of subject matter
jurisdiction, lack of personal jurisdiction, and failure to
state a claim by Defendant McCormick Advisory Group ("MAG")
(paper 42). Also pending are several motions by Plaintiff
International Association of Machinists and Aerospace Workers
("IAM"): two motions to seal certain exhibits (papers 52, 83),
a motion to amend its complaint (paper 59), a motion to strike
(paper 79), and a motion to file a surreply (paper 82).
Magistrate Judge Charles B. Day recently resolved a motion for

_____

[1] The thrust of Defendants' argument is: (1) that
Plaintiff's two federal claims should be dismissed for failing
to state claims for relief, and (2) that the court should
decline to exercise supplemental jurisdiction over the remaining
state law claims.

sanctions (paper 86), which is now the subject of objections (papers 94 and 100), spawning yet another motion, Plaintiff IAM's motion for leave to file a response (paper 96).   The issues have been fully briefed and the court now rules, no hearing being deemed necessary.   Local Rule 105.6.   For the following reasons, Defendant MAG's motion to dismiss for lack of subject matter jurisdiction will be denied,[2] but the motion to dismiss the federal claims for failure to state a claim will be granted.   Because the court will dismiss the only two federal claims in this action and will decline to exercise supplemental jurisdiction pursuant to § 1367(c)(3), the case will be dismissed and many of the remaining motions will be denied as moot.   The court will grant the motions to seal, and resolve the sanctions issues.   The other motions will be denied without prejudice as moot.

## I.   Background

### A.   *Factual Background*

The following facts have been alleged by Plaintiff IAM.   IAM is an international labor organization that represents approximately 700,000 employees in various industries.   It currently is the union representative of approximately 10,300

---

[2] The court will not reach MAG's motion to dismiss for lack of personal jurisdiction.

Continental and ExpressJet Airlines flight attendants.   It maintains its headquarters, or "Grand Lodge," in Upper Marlboro, Maryland.   From April 2003 to May 2004, Defendant Werner-Masuda was the Secretary-Treasurer of Local Lodge 2339N, a subordinate body of the larger union.[3]   As Secretary-Treasurer, Defendant Werner-Masuda had authorized access to a secure, proprietary website ("VLodge"), from which she could access IAM's confidential membership list.   Plaintiff alleges that VLodge, and the membership list stored therein, is housed on IAM's server at the Grand Lodge in Maryland.   As a requisite to obtaining an IAM user identification number and password, Defendant Werner-Masuda signed a Registration Agreement stipulating "not to use the information provided through VLodge for any purpose that would be contrary to the policies and procedures established by the [IAM] Constitution."   *See* (paper 1) ("Complaint"), ¶ 18; Ex. A ("Registration Agreement").

Plaintiff alleges that from March through May 2004, while Werner-Masuda was a member of IAM and Secretary-Treasurer of Lodge 2339N, she accessed the confidential membership information on VLodge, on behalf of herself and Defendant UIFA. At the time, UIFA was a recently formed entity, created for the

---

[3] According to Plaintiff's complaint, IAM is comprised of approximately 1,000 local lodges within 80 Districts.   Each District has two or more locals.

purpose of challenging IAM's union representation of Continental and ExpressJet flight attendants. Plaintiff alleges that Werner-Masuda used her status as an IAM officer, which allowed her access to VLodge, to retrieve the name and address information stored therein to contact IAM members in order to organize UIFA, and, subsequently, to challenge IAM's representation.

To support its claim, Plaintiff alleges that Werner-Masuda's identification number had been used to click on the VLodge member search tool approximately 10,000 times between March and May 2004 in order to search the names and addresses of every member in four different IAM local lodges. According to Plaintiff, the members of these four locals comprise the exact same members that Defendant UIFA is attempting to organize into a rival union. Moreover, Plaintiff alleges that a UIFA mailing that went out near the end of June 2004 was sent only to IAM members in these four locals.

According to Plaintiff, Defendant McCormick Advisory Group ("MAG") "is staffing UIFA's efforts to replace the IAM as the representative of the Continental/ExpressJet flight attendants." *See* Complaint, ¶ 7. Plaintiff alleges that MAG has used the list to contact members of IAM, including residents of Maryland, through its on-going mass mailing campaign.

### B.   Procedural History

On August 5, 2004, Plaintiff filed a complaint for preliminary and permanent injunctive relief, as well as damages, asserting eight (8) counts against Werner-Masuda, UIFA, and/or MAG.  Counts I, II, V, and VI of Plaintiff's complaint allege violations by Werner-Masuda and UIFA (by and through the actions of Werner-Masuda) of the Federal Stored Communications Act (count I), the Federal Computer Fraud and Abuse Act (count II), as well as the common law torts of trespass to chattel (count V) and fraud (count VI).  Count III is a claim for breach of contract against Werner-Masuda.  Counts IV, VII, and VIII allege claims against all defendants for violation of the Maryland Uniform Trade Secrets Act (count IV), conversion (count VII), and unjust enrichment (count VIII).  Before a hearing was held on Plaintiff's request for preliminary relief, Defendants Werner-Masuda, on her own behalf and in her capacity as interim President of UIFA, and MAG filed separate motions to dismiss. Werner-Masuda contends that Plaintiff's complaint fails to state claims for relief under the two federal statutes, and that the court should decline to exercise supplemental jurisdiction over the remaining state law claims.  (Paper 33).  MAG moves to dismiss on the basis that the court lacks subject matter jurisdiction over this action, lacks personal jurisdiction over

it, and, alternatively, that the complaint fails to state a claim for relief.  (Paper 42).

Subsequent to the filing of these motions, the court held a hearing on Plaintiff's motion for preliminary injunction on September 17, 2004.  That motion was denied.  *See* (paper 52). Shortly thereafter, Plaintiff filed a motion for leave to amend its complaint in order to set forth additional background information pertaining to MAG's contacts with Maryland and to add two additional counts.  Plaintiff also named an additional defendant in its amended complaint, Vicky Warlick.  *See* (paper 59).

After the two motions to dismiss and Plaintiff's motion to amend had been fully briefed, Defendant MAG and Plaintiff were granted additional time to supplement their papers in support of, and in opposition to, MAG's motion to dismiss.  *See* (paper 65).  However, MAG's supplemental filing prompted several more motions by Plaintiff, including a motion to strike (paper 79), a motion for leave to file a surreply (paper 82), and a motion to seal an exhibit used in support of its surreply (paper 83). Plaintiff also moved for sanctions against Defendant UIFA for alleged discovery violations. (Paper 86).  After that motion was resolved by Magistrate Judge Day, UIFA filed a motion for relief from the order and objections to the monetary award.  (Papers 94

and 100).   Plaintiff seeks leave to file a response to the objections (paper 96), and those issues are also before the court.   All motions are fully briefed and ready for resolution.

## II.  Plaintiff's Motions to Seal

Plaintiff has filed two unopposed motions to seal certain exhibits in connection with this matter.   In order to place the exhibits under seal, this court must determine "that the denial [of access] serves an important governmental interest and that there is no less restrictive way to serve that governmental interest."  *Rushford v. New Yorker Magazine*, 846 F.2d 249, 253 (4th Cir. 1988); *see also Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 614 (D.Md. 2002).   To make that determination, the court "must follow [certain] procedural requirements." *Rushford*, 846 F.2d at 253.   "Under *Knight*, a court must first give the public notice of a request to seal and a reasonable opportunity to challenge it."  *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 181 (4th Cir. 1988) (citing *In re Knight Publishing Co.*, 743 F.2d 231, 235 (4th Cir. 1984)).   Additionally, the court must "consider less drastic alternatives to sealing and, if it decides to seal documents, must 'state the reasons for its decision to seal . . ., and the reasons for rejecting alternatives to sealing

in order to provide an adequate record for review.'" *Stone*, 855 F.2d at 181 (quoting *Knight*, 743 F.2d at 235).

Plaintiff's two motions to seal have been docketed and made available to the public since September 2004 (paper 52) and February 2005 (paper 83), thereby providing sufficient notice under the requirements of *Knight* and *Stone*. *See Padco Advisors, Inc.*, 179 F.Supp.2d at 614. No objections to sealing these exhibits have been received. Moreover, the exhibits Plaintiff seeks to seal contain the precise confidential membership information that rests at the heart of this case and that it asserts constitutes a "trade secret" under Maryland's Uniform Trade Secret Act. Plaintiff requests that the court seal these exhibits "to protect their confidentiality and ensure that they are not maintained as publicly available." (Paper 52). Because the confidential information is central to the merits of the complaint before the court, and in light of the absence of objection to the motions, the motions to seal will be granted. *Stratagene v. Invitrogen Corp.*, 206 F.R.D. 121, 122 (D.Md. 2002) (granting a motion to seal where "the confidential information [was] tangential to the merits of the complaint").

## III. Sanctions

On June 23, 2005, Magistrate Judge Day granted Plaintiff's motion for sanctions and ordered that: (1) UIFA would be

precluded from disputing any information provided in any 30(b)(6) deposition regarding the compilation of their June 2004 mailing and their specific activities regarding IAM's membership records and (2) UIFA and its counsel pay the costs incurred by IAM, including attorneys' fees, for litigating the motion for sanctions, taking the first UIFA 30(b)(6) deposition, and two-thirds of the costs in taking the second deposition.  On August 12, 2005, Magistrate Judge Day entered an order awarding $15,096.70 in sanctions against UIFA and its counsel.  UIFA filed a motion for relief from the order, asserting objections to the rulings of the magistrate judge, and later also filed an objection to the amount of sanctions awarded.  (Papers 94 and 100).  Plaintiff seeks leave to respond (paper 96) which UIFA opposes.  Plaintiff has every right to be heard on review of the magistrate judge's decision, its motion will be granted, and the court will consider Plaintiff's response in its analysis.[4]

On review of a magistrate judge's decision on a non-dispositive matter, the court reviews findings of fact for clear error, and conclusions of law *de novo*:

> Under 28 U.S.C. § 636(1)(A), non-dispositive pretrial matters may be referred to a magistrate judge for hearing and determination. A district judge may

---

[4] Plaintiff attached its response to its motion for leave to respond. (Paper 96).

> modify or set aside any portion of a
> magistrate judge's non-dispositive ruling
> "where it has been shown that the magistrate
> judge's order is clearly erroneous or
> contrary to law." *Id.*; see also Fed.R.Civ.P.
> 72(a). Under the clearly erroneous standard,
> the reviewing court is not to ask whether the
> finding is the best or only conclusion
> permissible based on the evidence. Nor is it
> to substitute its own conclusions for that of
> the magistrate judge. *See Tri-Star Airlines,
> Inc. v. Willis Careen Corp.*, 75 F.Supp.2d
> 835, 839 (W.D.Tenn. 1999). Rather, the court
> is only required to determine whether the
> magistrate judge's findings are reasonable
> and supported by the evidence. *Id*. It is not
> the function of objections to discovery
> rulings to allow wholesale relitigation of
> issues resolved by the magistrate judge."
> *Buchanan v. Consol. Stores Corp.*, 206 F.R.D.
> 123 (D.Md. 2002).

*Berman v. Cong. Towers Ltd. P'ship-Section I*, 325 F.Supp.2d 590,

592 (D.Md. 2004).

UIFA first objects to the imposition of any sanctions,

contending generally that: (1) IAM impermissibly expanded the

scope of the permitted deposition, (2) the collective responses

on behalf of UIFA provide all necessary information, (3) UIFA

does not have acceptable responses to IAM's questions, (4) UIFA

does not have a copy of the mailing list and it is unfair to

prevent it from disputing information provided in a 30(b)(6)

deposition, (5) UIFA was not provided a hearing on the sanctions

motion, (6) UIFA was not issued any findings of fact and thus

denied due process, and (7) the proposed monetary sanctions are

10

draconian and unjustified.  UIFA also objects to the amount of the monetary award, contending that there is no assessment of the reasonableness of the amount.  Furthermore, it claims that Fed.R.Civ.P. 37(b) is intended to be punitive for unjust refusal to provide discovery, which, it claims, has not been shown.

Although review of the magistrate judge's decisions is hampered by the paucity of analysis underlying them, the court has reviewed the record in light of the objections raised, and will modify the rulings in part.  There is no requirement that the court conduct an oral hearing.  UIFA had a full opportunity, through the motion papers, to be heard.

Plaintiff moved for sanctions against Defendant UIFA for failing to provide an adequate Rule 30(b)(6) witness on two occasions, in contravention of two separate court orders permitting such discovery to take place.  *See* (papers 36, 65). Specifically, it asserted that UIFA's first 30(b)(6) witness, John Liu, had no knowledge of any of the specific issues outlined in the deposition notice, that he had not been properly prepared before the deposition, and that he possessed no knowledge regarding even basic information about UIFA. Plaintiff contended that UIFA's second 30(b)(6) witness, James Ryan, was only marginally more informative, that he was unable to provide any information on behalf of UIFA other than that which was from his

11

own personal knowledge, and that UIFA and/or its counsel made no effort to prepare him in advance. UIFA countered that Plaintiff's request was frivolous, arguing that Plaintiff had, through other depositions and document productions, received all the information it sought in Liu's and Ryan's depositions, and that there is simply "nothing else to discover." (Paper 89, at 3). Whether this may in fact be the case does not address the issue of whether Liu and Ryan were so woefully inadequate and ill-prepared that sanctions are warranted. UIFA now concedes that the first 30(b)(6) deposition, of Mr. Liu was not adequate. (Paper 94, at 8).

Rule 30(b)(6) provides that persons designated to represent an organization "shall testify as to matters known or reasonably available to the organization." This means that UIFA "is obligated to produce one or more 30(b)(6) witnesses who were thoroughly educated about the noticed deposition topics with respect to any and all facts known to [UIFA] or its counsel . . . ." *In re Vitamins Antitrust Litig.*, 216 F.R.D 168, 172 (D.D.C. 2003). The duty to designate and prepare witnesses for Rule 30(b)(6) depositions has been stated succinctly and with great clarity by Magistrate Judge Eliason of the Middle District of North Carolina:

The testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponents. The designated witness is "speaking for the corporation," and this testimony must be distinguished from that of a "mere corporate employee" whose deposition is not considered that of the corporation and whose presence must be obtained by subpoena. 8A Wright, Miller & Marcus, [*Federal Practice and Procedure*] § 2103, at 36-37 [(1994)]. "Obviously it is not literally possible to take the deposition of a corporation; instead, when a corporation is involved, the information sought must be obtained from natural persons who can speak for the corporation." 8A Wright, Miller & Marcus, § 2103, at 30. The corporation appears vicariously through its designee. *Resolution Trust Corp. v. Southern Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993). If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation. *Dravo Corp. v. Liberty Mut. Ins. Co.*, 164 F.R.D. 70, 75 (D.Neb. 1995) (citing *Marker [v. Union Fid. Life Ins. Co.]*, 125 F.R.D. [121,] 126 [(M.D.N.C. 1989)]). Thus, the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved. *Buycks-Roberson v. Citibank Federal Sav. Bank*, 162 F.R.D. 338, 343 (N.D.Ill. 1995); *S.E.C. v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992).

*United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996).

Moreover,

Rule 30(b)(6) explicitly requires [an organization] to have persons testify on its

13

> behalf as to all matters known or reasonably
> available to it and, therefore, implicitly
> requires such persons to review all matters
> known or reasonably available to it in
> preparation for the Rule 30(b)(6) deposition.
> This interpretation is necessary in order to
> make the deposition a meaningful one and to
> prevent the "sandbagging" of an opponent by
> conducting a half-hearted inquiry before the
> deposition but a thorough and vigorous one
> before the trial.  This would totally defeat
> the purpose of the discovery process.  The
> Court understands that preparing for a Rule
> 30(b)(6) deposition can be burdensome.
> However, this is merely the result of the
> concomitant obligation from the privilege of
> being able to use the corporate form in order
> to conduct business.

*Id.* at 362; *see also Paul Revere Life Ins. Co. v. Jafari*, 206

F.R.D. 126 (D.Md. 2002).

Reviewing the transcript of Mr. Liu's deposition submitted

by Plaintiff, it is abundantly clear the he was woefully

unprepared. First, Mr. Liu had no knowledge at all regarding any

of the subjects listed on the 30(b)(6) notice, and, in fact, had

not even seen the notice until it was shown to him during the

deposition. (Paper 86, Ex. C ("Liu Dep."), at 7).  Further, he

testified that he personally had undertaken no steps to prepare

for the deposition and that UIFA and its counsel had not made any

effort to prepare him, other than advising him to tell the truth.

*Id.* at 11, 16-17.  Moreover, not only did he not possess any

knowledge regarding the specific topics noted for the deposition,

14

he lacked even basic knowledge regarding UIFA as an organization. He stated that he had never participated in a meeting for UIFA, and did not know how its officers were selected, when it was formed, or even the location of its headquarters. *Id.* at 12, 19. Perhaps Mr. Liu's utter lack of information regarding UIFA was because Mr. Liu's only connection with UIFA was as a part-time volunteer, beginning in July 2004, handing out flyers at the Newark airport on three occasions. *Id.* at 11. As such, Mr. Liu was not even associated with UIFA during the time it was allegedly receiving and compiling the membership information Werner-Masuda was allegedly providing from March through May 2004. The fact that he was woefully unprepared and inadequate to serve as a 30(b)(6) witness is best illustrated by the following exchange between Plaintiff's counsel and Mr. Liu. After a string of successive "I don't  know[s]," (fourteen by the court's count), Plaintiff's counsel asked pointedly:

> Q.   Mr. Liu, you keep on saying I don't know.  You
>      understand you are here today as a representative
>      of UIFA, and your answers bind UIFA.  When you say
>      I don't know, that means UIFA does not know.  You
>      understand that?

> A.   I don't have any knowledge of what question you
>      are asking me.  I don't have the answer.

> Q.   So when you answer I don't know, that means UIFA
>      does not know.

15

> A. *I don't know if UIFA does know or does not know.*
> *I don't know . . . .*

*Id*. at 20 (emphasis added). This response, and others like it, demonstrate that UIFA "failed to meet its obligations to produce a Rule 30(b)(6) witness properly educated as to the noticed deposition topics." *In re Vitamins*, 216 F.R.D. at 173. Not only did UIFA designate an individual who had no personal knowledge about virtually anything regarding UIFA, much less the specific, noted matters set forth in the deposition notice, it utterly failed "to prepare [him] so that [he] may give knowledgeable and binding answers for the corporation." *Taylor*, 166 F.R.D. at 361; *see also Poole ex. rel. Elliot v. Textron, Inc.*, 192 F.R.D. 494, 504 (D.Md. 2000) (stating that in advance of a 30(b)(6) deposition, an organization "has an obligation to investigate and identify and if necessary prepare a designee for each listed subject area"). Neither UIFA nor its counsel had shown Mr. Liu the deposition notice prior to the day of the deposition, and no efforts, either in the form of a conversation or review of documents, were undertaken to prepare him for the deposition. In light of the fact that Mr. Liu seemingly had such little personal knowledge regarding UIFA, its failure to prepare him in any meaningful way, indeed in any way at all, cannot be tolerated.

After Mr. Liu's deposition, on November 19, 2004, Magistrate Judge Connelly entered an order permitting, *inter alia*, Plaintiff to take another 30(b)(6) deposition of UIFA.[5]  *See* (paper 65). Two days before its scheduled date, Plaintiff's counsel sent UIFA's counsel a letter informing it of its obligation to provide an adequate 30(b)(6) witness.  *See* (paper 86, Ex. D).  It also informed UIFA's counsel of its intention to move for sanctions should UIFA again fail to provide an adequately prepared witness.

On February 17, 2005, Plaintiff deposed James Ryan as UIFA's 30(b)(6) witness.  Plaintiff asserts, and the court agrees, Mr. Ryan was only marginally more prepared than Mr. Liu.  Unlike Mr. Liu, Mr. Ryan had been given the deposition notice prior to testifying, and thus, was at least aware of what subjects would be covered.  *See* paper 86, Ex. E ("Ryan Dep.") at 7-8.  As the exhibits filed by Plaintiff indicate, however, Mr. Ryan had no knowledge whatsoever of four of the twelve topics noted in the deposition notice.  Of the remaining eight topics, Mr. Ryan's testimony with respect to several of them was based solely on his personal knowledge, stating throughout that he was unable to

---

[5] Plaintiff asserts that it proposed going forward with the second deposition at the beginning of January 2005, but that UIFA informed it that a designee would not be available until February.  It was ultimately scheduled for February 17, 2005.

speak on behalf of UIFA as to its knowledge.  *Id*. at 55, 63, 86,
91.  However, Rule 30(b)(6) requires that "[t]he individuals so
deposed . . . testify to the knowledge of the corporation, *not*
the individual."  *Powell*, 192 F.R.D. at 504 (emphasis in
original).  Moreover, like Mr. Liu, Mr. Ryan testified that,
other than e-mailing him the deposition notice, UIFA had done
nothing to educate or prepare him to testify on UIFA's behalf.
*Id*. at 8, 10-11.  This fact is evident in the following exchange
between Plaintiff's counsel ("Q"), Mr. Ryan ("A"), and UIFA's
counsel:

> Q. UIFA has no knowledge that Vickie [Warlick]
>    assembled mailing list information from legitimate
>    sources?
>
> A. Again, I can't – I can only tell you what I was
>    doing.
>
> Q. Okay.  Well, if the answer is UIFA doesn't know,
>    that's the answer.  Is that what you are
>    testifying?
>
> A. I am not UIFA.
>
> Q. You are, for the purposes of the deposition.
>
> [UIFA's counsel]:  For the purposes of this
>                    deposition you are.
>
> A. Me solely?
>
> [UIFA's counsel]:  You solely.

*Id*. at 19.  This exchange indicates that UIFA not only failed to
meet its obligation adequately to prepare Mr. Ryan on the

18

subjects that were outside his personal knowledge, but that he was not even aware until the deposition had begun that he was speaking for the corporation. Again, such apparent lack of preparation cannot be tolerated.

Defendant UIFA opposed Plaintiff's motion, arguing that through other non-30(b)(6) depositions and document productions, Plaintiff had obtained all that is discoverable. (Paper 89, at 6). It also asserts that "[i]f the remaining nine (9) or so UIFA volunteers were to be [deposed], IAM would have the same information they now have." *Id*. Although this assertion may be true, it hardly excuses its failure to prepare these two designees. In light of the obvious lack of preparation displayed in both Mr. Liu's and Mr. Ryan's depositions, some sanctions are warranted.

"Monetary sanctions are mandatory under Rule 37(d) for failure to appear by means of wholly failing to educate a Rule 30(b)(6) witness, unless the conduct was substantially justified." *In re Vitamins*, 219 F.R.D. at 174. The rule provides that a court "shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure . . . ." Fed.R.Civ.P. 37(d). Recognizing that the first deposition was scheduled on a somewhat expedited basis, Defendant UIFA still

had ample time to locate an acceptable 30(b)(6) designee and educate him as to the subjects to be covered.  Not only was no effort made to prepare Mr. Liu, he had not even seen the notice and subjects to be covered until the deposition had begun.  In an effort to "remedy the defective Liu deposition," Plaintiff sought and obtained a second court order to proceed with a second UIFA 30(b)(6) deposition, which was only marginally better. Magistrate Judge Day's assessment that UIFA pay the reasonable expenses in taking the first deposition and two thirds of the expense of the second was surely a measured response to the discovery violation.

As this court has stated before in imposing discovery sanctions:

> In determining the proper fee award, the court starts with the "lodestar" figure, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *see Envirosource, Inc. v. Horsehead Resource Dev. Co.*, 981 F.Supp. 876, 881 (S.D.N.Y. 1998) (using lodestar method to award attorney's fees as sanction for discovery violation ); *Trbovich v. Ritz-Carlton Hotel Co.*, 166 F.R.D. 30, 32 (E.D.Mo. 1996) (same); *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 266 (S.D.N.Y. 1995) (same).  Absent circumstances warranting adjustment, the lodestar figure represents the proper total fee award.  *Wileman v. Frank*, 780 F.Supp. 1063, 1064 (D.Md. 1991) (citing *Blum v.*

> *Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541,
> 79 L.Ed.2d 891 (1984)).  In deciding what
> constitutes a "reasonable" number of hours
> and rate, the district court generally is
> guided by the following factors:
>
> > "(1) the time and labor expended;
> > (2) the novelty and difficulty of
> > the questions raised; (3) the skill
> > required to properly perform the
> > legal services rendered; (4) the
> > attorney's opportunity costs in
> > pressing the instant litigation;
> > (5) the customary fee for like
> > work;  (6)  the  attorney's
> > expectations at the outset of the
> > litigation;  (7)  the  time
> > limitations imposed by the client
> > or circumstances; (8) the amount in
> > controversy  and  the  results
> > obtained;  (9)  the  experience,
> > reputation and ability of the
> > attorney; (10) the undesirability
> > of  the  case  within  the  legal
> > community in which the suit arose;
> > (11) the nature and length of the
> > professional relationship between
> > attorney  and  client;  and  (12)
> > attorneys' fees awards in similar
> > cases."
>
> *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th
> Cir. 1998) (quoting *EEOC v. Service News Co.*,
> 898 F.2d 958, 965 (4th Cir. 1990) (quoting
> *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226
> n. 28 (4th Cir. 1978))).

*CoStar Group, Inc. v. LoopNet, Inc.*, 106 F.Supp.2d 780, 787

(D.Md. 2000).

In light of that standard, the undersigned finds that there

is insufficient substantiation for the need for all of the hours

21

expended by so many different professionals, and that Magistrate Judge Day's overall award is too large.  The documentation is not in the form of contemporaneous time records, but instead is a summary chart.  Moreover, the description of the task performed is vague.  As suggested by UIFA, the number of hours claimed is excessive.  The records supplied do not enable the court to count with any precision the hours that would properly be spent on the depositions, and preparing for them.  At best, then, because some monetary sanction is appropriate, the court can determine an overall reasonable fee for those efforts.  The court will award fees only for Ms. O'Brien's time, in the sum of $1500 for the first deposition, and $2400 for the second.  The costs of obtaining a copy of each deposition will be reduced to match those paid by UIFA.

Magistrate Judge Day also ordered that UIFA and its counsel pay the attorneys' fees for preparing the motion papers and apparently concluded that all but a few of the hours claimed were reasonable.  While he excluded hours on certain dates, he did not explain precisely why, and the entries for those dates do not reveal his logic.  Moreover, the mathematical calculations do not appear to match the documentation provided.  In any event, the undersigned concludes that UIFA and its counsel should not bear the entire cost of IAM's fees in litigating the sanctions issues,

and that the number of hours is again inflated.  As pointed out by UIFA, experienced counsel should not need quite so much time to research and draft the papers.  The court will award $3500, for 20 hours by Ms. O'Brien at $ 175 per hour in fees for the motions practice.

The total monetary award will be $7947.30.

Finally, Magistrate Judge Day ordered that UIFA would be precluded from disputing any information provided in any 30(b)(6) deposition regarding the compilation of their June 2004 mailing and their specific activities regarding IAM's membership records.

Having been given two chances to provide the requested information, UIFA should be held to that level of response and not be permitted to contradict or supplement later.  As will be explained below, however, the federal claims will be dismissed for failure to state a claim, and the remaining state law claims dismissed without prejudice.  Only because the case will not continue in this court, the portion of Magistrate Judge Day's order restricting UIFA, in this litigation, from disputing the testimony given, is revoked.

## IV.  Motions to Dismiss

### A.   *Lack of Subject Matter Jurisdiction*

Motions to dismiss for lack of subject matter jurisdiction are governed by Fed.R.Civ.P. 12(b)(1).  The plaintiff bears the

burden of proving that subject matter jurisdiction properly exists in the federal court. *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). In a 12(b)(1) motion, the court "may consider evidence outside the pleadings" to help determine whether it has jurisdiction over the case before it. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see also Evans*, 166 F.3d at 647.   The court should grant the 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond*, 945 F.2d at 768.

### B.   *Failure to State a Claim*

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).   Accordingly, a 12(b)(6) motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).   Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which

requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court must disregard the contrary allegations of the opposing party. *See A.S. Abell Co. v. Chell*, 412 F.2d 712, 715 (4th Cir. 1969). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

**V.   Analysis**

   **A.   *MAG's Motion to Dismiss for Lack of Subject Matter Jurisdiction***

MAG has moved to dismiss Plaintiff's complaint on the grounds that Plaintiff's action constitutes an inter-union

representation dispute over which this court lacks subject matter jurisdiction. Because a favorable ruling for MAG would mandate dismissal of the entire action against all Defendants, the court will address this issue at the outset.[6] "Under § 2, Ninth, of the [Railway Labor] Act [("RLA")], the National Mediation Board [("NMB")] has exclusive jurisdiction over representation disputes." *Western Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1302-03 (1987) (citing 45 U.S.C. §§ 152, 181 (1986)). The critical question, thus, is whether this action is a representation dispute over which the NMB has exclusive jurisdiction. The court concludes that it is not.

The issue here is whether Defendants have improperly obtained and used Plaintiff's confidential membership list in violation of federal and state law. Although their purpose for obtaining the list may have been to rally and solicit IAM members to call for a vote to change their union representative, this does not make it a "representation dispute" within the exclusive jurisdiction of the NMB.[7] Rather, as the cases MAG cites make

---

[6] *See McKeel v. United States*, 178 F.Supp.2d 493 (D.Md. 2001) (the determination of jurisdiction is a threshold issue, requiring the court to resolve a motion to dismiss based on subject matter jurisdiction at the outset).

[7] Indeed, by this logic, any action, no matter how unlawful, criminal, or egregious, would fall within the exclusive jurisdiction of the NMB if done for the purpose of challenging
(continued...)

clear, "'[r]epresentation' disputes involve defining the bargaining unit and determining the employee representative for collective bargaining." *Western Airlines, Inc.*, 480 U.S. at 1302; *see also, e.g.*, *Indep. Fed'n of Flight Attendants v. Cooper*, 141 F.3d 900, 903 (8th Cir. 1998) (holding that the plaintiff's claims were preempted where the NMB had already made certain factual and legal determinations in an earlier certification proceeding and that subsequent action by the court "would be the functional equivalent of judicial review of that decision"); *United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1216 (7th Cir. 1996) (holding that a dispute surrounding the interpretation of an existing collective bargaining agreement ("CBA") between the plaintiff and defendant regarding whether its provisions apply to the defendant's newly formed subsidiary "raises a dispute over representation that is within the NMB's exclusive jurisdiction"); *Air Line Pilots Ass'n v. Texas Int'l Airlines, Inc.*, 656 F.2d 16, 22 (2nd Cir. 1981) (holding that deciding whether an existing CBA between the plaintiff and defendant applied to a new corporation formed after the defendant underwent a corporate restructuring "would necessarily involve [the] Court in determining, as a substantive matter, whether [the

---

[7](...continued)
a union's representation.

plaintiff was] the proper representative of the [newly formed company's] pilots," and, thus, was a representation dispute over which the court lacked subject matter jurisdiction).

In *Cooper*, a case which MAG analogizes to the matter *sub judice*, IFFA, the incumbent union representative of TWA's flight attendants, brought suit against its former president, Cooper, and IAM, a rival union.  IFFA alleged that the defendants misappropriated trade secrets by using IFFA's logo and membership list to campaign for, initially a merger, but after that was unsuccessful, IFFA's de-certification.  141 F.3d at 901-02. Prior to the suit in district court, IAM successfully filed a representation application under the RLA, prompting the NMB to conduct a representation election.  *Id*. at 902.  During the election process, IFFA filed allegations of election interference with the NMB on the basis of the allegedly "stolen" membership list.  The NMB concluded that IFFA's allegations did not warrant further investigation and that IAM had not acted improperly.[8]

---

[8] In determining that IAM had not acted improperly, the NMB stated:

> The record establishes that the IAM's use of the address labels provided by Cooper for campaign rather than merger purposes was not contemplated specifically by the IAM when Cooper obtained the list for it.  Rather the IAM decided to use the address labels for
>
> (continued...)

The Board then counted the election ballots and announced IAM had won the election.   *Id*.

After the Board's election and certification decision, IFFA sued IAM in district court, alleging misappropriation of trade secrets and tortious interference with contract.   On appeal, the circuit court affirmed the district court's dismissal based on preemption grounds.   Recognizing, however, that "certain causes of action arising out of representation disputes are not preempted by the RLA," the court could "conceive of no remedy for these claims that would not *impermissibly involve the Mediation Board's certification decision*."   *Id*. at 903 (emphasis added). First, the NMB had already determined in its proceeding that IAM did not engage in unlawful conduct when it utilized Cooper, and thus, "[a]n injunction against IAM's future employment of Cooper would be the functional equivalent of judicial review of that conclusion, which is clearly prohibited."   *Id*. (citing *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297,

---

[8](...continued)
> organizational purposes when IFFA's Executive Board declined to vote on the merger.   That decision does not constitute "fraud, coercion, or unlawful conduct" in violation of Section 2, Ninth, of the [Railway Labor] Act.

*In re Int'l Ass'n of Machinists and Aerospace Workers*, 24 NMB 141, 175, 1997 WL 120095, at *17 (N.M.B. Feb. 27, 1997).

300 (1943) (holding "that the District Court did not have the power to review the action of the National Mediation Board in issuing the [election] certificate")). Second, the court found that a judgment awarding IFFA reimbursement for the cost in defending against IAM's campaign "would have the effect of making the party that prevailed in front of the Mediation Board pay the costs of the loser. Such an outcome would reach into the exclusive power of the National Mediation Board over the labor disputes of common carriers." *Cooper*, 141 F.3d at 903. Accordingly, the claims advanced and remedies sought were "inextricably intertwined with a representation dispute," and, thus, "within the exclusive jurisdiction of the National Mediation Board." *Id*.

Conversely, as the *Cooper* court recognized, "there is no preemption when the conduct complained of is only of peripheral concern to the RLA." *Id*. In *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260 (1994), the Court stated that "a state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA." Thus, it held that the plaintiff's claims for wrongful discharge in violation of public policy and the state whistleblower act were not preempted by the RLA. *Id*. at 266.

Moreover, even in the context of a representation dispute, courts have held that a claim for damages is not necessarily preempted. *See, e.g., Ass'n of Flight Attendants v. Delta Air Lines, Inc.*, 879 F.2d 906, 909 (D.C.Cir. 1989). In *Delta*, a union sued for breach of a survivorship clause in a CBA that provided all successors or merged companies would be bound by the CBA. Western, the party to the CBA, merged with Delta and ceased to exist. Delta refused to be bound by the CBA, and AFA, the plaintiff union, was subsequently decertified as Delta's representative. The union brought suit in district court seeking, *inter alia*, damages for Delta's failure to recognize the CBA. On appeal, the circuit court held that the union could bring a suit for damages in federal district court because "an award of damages would have no effect on the NMB's certification determination. . . . [and] would not cause any confusion as to which union is the proper . . . representative." *Id.* at 913-14.

Thus, from *Delta*, "[t]he test for RLA preemption is whether an award of damages would be the functional equivalent of resolving the representation dispute." *Cooper*, 141 F.3d at 903 (citing *Delta*, 879 F.2d at 915-17). Although here, Plaintiff seeks both injunctive relief and damages, the principle remains the same: Will the court's action be the functional equivalent of resolving a representation dispute? In short, the answer is no.

31

As stated above, this action does not involve a representation dispute. Plaintiff is not asking the court to decide which group is the proper union representative; it is not asking the court to interpret a CBA; and, it is not asking the court to go behind an NMB decision. "Neither the certification (or decertification) of a representative, nor the functional equivalent thereof, nor anything even remotely akin thereto, is at stake." *Delta*, 879 F.2d at 914. Thus, enjoining Defendants from using the information derived from Plaintiff and/or awarding damages if warranted would not alter the fundamental fact that Plaintiff is, presently, the union representative. Accordingly, this action is not a representation dispute falling within the exclusive jurisdiction of the NMB and the motion to dismiss for lack of subject matter jurisdiction will be denied.

### B.   *Motion to Dismiss for Failure to State a Claim*

Related to the issue of subject matter jurisdiction is the question of supplemental jurisdiction raised in the motions to dismiss. Defendants contend that Plaintiff has failed to state claims under either the Stored Wire and Electronic Communications and Transactional Records Access Act ("SECA"), 18 U.S.C. §§ 2701, *et seq.*, or the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, the only federal claims asserted. Defendants argue that these claims should be dismissed, and because there is no other

basis for original jurisdiction, that the court should decline to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c).   Because a favorable ruling, granting the motion to dismiss and declining to exercise supplemental jurisdiction, would result in a dismissal of this action against all Defendants, this motion should be decided at the outset.   For the following reasons, the motion will be granted, and the court will decline to exercise supplemental jurisdiction over the remaining claims.

Plaintiff has alleged that Defendant Werner-Masuda violated the SECA and the CFAA when she intentionally accessed VLodge in a manner that exceeded her authorization under the Registration Agreement.   *See*   Complaint, ¶¶ 35-42.   A prerequisite to liability under both the SECA and the CFAA is that the alleged violator has accessed the computer either without authorization, or in excess of authorization.[9]   Werner-Masuda has moved to

---

[9] Section 2701(a) of the SECA provides that:

[W]hoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

(continued...)

dismiss these claims on the basis that she was authorized to access and obtain Plaintiff's membership list, and, thus, she did not access the information contained in VLodge either without authorization or in excess of her authorization.

---

[9](...continued)
18 U.S.C. § 2701(a).  Although the SECA is a criminal statute, § 2707 provides a civil cause of action to "any provider of electronic communication service, subscriber, or other person aggrieved by any violation" of the SECA.  *Id*. § 2707(a).

Similarly, the three provisions of the CFAA Plaintiff alleges Werner-Masuda violated provide that, whoever:

> intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer if the conduct involved an interstate or foreign communication[, 18 U.S.C. § 1030(a)(2)(C)]; or . . .

> knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period[, § 1030(a)(4)]; or . . .

> intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage[, § 1030(a)(5)(A)(iii)]; shall be punished as provided in subsection (c) of [the statute].

§ 1030(a).  Like the SECA, although the CFAA is a criminal statute, it provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  *Id*. § 1030(g).

Federal courts interpreting these statutes have noted that their "general purpose . . . was to create a cause of action against 'computer hackers (e.g., electronic trespassers).'" *Sherman & Co. v. Salton Maxim Housewares, Inc.* 94 F.Supp.2d 817, 820 (E.D.Mich. 2000) (quoting *State Wide Photocopy Corp. v. Tokai Fin. Servs., Inc.*, 909 F.Supp. 137, 145 (S.D.N.Y. 1995) (discussing the SECA)); *see also In re America Online, Inc.*, 168 F.Supp.2d 1359, 1370 (S.D.Fla. 2001) (looking to legislative history and finding that the phrase "without authorization" in the CFAA "contemplate[s] a situation where an outsider, or someone without authorization, accesses a computer"); *see also* S.Rep.No. 101-544, at 4-5 (1990) (indicating that a civil cause of action was created under the CFAA to redress damage and loss as a result of serious computer abuse, such as transmission of computer "viruses" and "worms"). Werner-Masuda argues that she is in no way the type of "outside" computer hacker or "high-tech" criminal these statutes were enacted to punish. *See* S.Rep.No. 99-432, at 4 (providing that the CFAA was not intended to be a "sweeping . . . Federal statute," but rather "aimed at deterring and punishing certain 'high-tech' crimes in a manner consistent the SECA and the CFAA require the underlying access to be either without authorization or in excess of authorization, she asserts that there can be no violation if access to the system is

35

authorized.  Indeed, § 2701(c)(1) provides that the statute "does not apply with respect to conduct authorized . . . by the person or entity providing a wire or electronic communications service."

In *Sherman*, 94 F.Supp.2d 817, the defendant, Salton, sought to amend its counterclaim against an ex-employee, Sherman, to add a claim under the SECA.  Salton alleged that Sherman improperly accessed certain sales information located in a secure network after his dismissal from Salton in violation of the SECA. While working for Salton, Sherman was a sales representative to K-Mart.  As an employee of Salton, Sherman was authorized to gain access to certain sales data in the K-Mart system pertaining to Salton's accounts using a computer access code that K-Mart had provided him.  The former employer alleged that after Sherman no longer worked for it, he continued to access K-Mart's computer system using the code which had not yet been "cut off," gaining access to Salton's account data and providing it to his new employer.  Specifically, Salton alleged that even though "Sherman did have authorization to log on to the Kmart computer system to access information about various vend[o]rs and their products that he was representing and that in fact Kmart continued to provide [Sherman] access to Salton information . . ., that Salton certainly did not authorize him to view this information, and he

36

knew he was not so authorized." *Id*. at 819 (internal quotations omitted).

Framing the question as "whether Salton ha[d] alleged and proffered sufficient proofs to create a colorable claim that such access was "unauthorized," the court concluded that Salton's proposed allegations did not state a claim for relief, and, accordingly, denied its motion to amend. *Id*. at 821.  It found that no violation of the SECA exists where the alleged violator is authorized to access the information.  It reasoned:

> Because section 2701 . . . prohibits only unauthorized access and not the misappropriation or disclosure of information, *there is no violation of section 2701 for a person with authorized access to the database no matter how malicious or larcenous his intended use of that access*.  Section 2701 outlaws illegal entry, not larceny.

*Id*. (emphasis added); *cf. Am. Computer Trust Leasing v. Jack Farrell Implement Co.*, 763 F.Supp. 1473, 1495 (D.Minn. 1991) (stating that where a party consents to another's access to its computer network, it cannot claim that such access was unauthorized).  Thus, because Salton admitted that Kmart had provided Sherman with authorization to log on to its computer network to access its information, and because Kmart continued to provide Sherman access to the information even after he no longer worked for Salton, the court held that it had not stated a claim of unauthorized access under the SECA, notwithstanding Sherman's

37

motive for accessing the information.     This construction is consistent with the interpretation Judge Motz provided in this district in *Educational Testing Service v. Stanley H. Kaplan, Educational Center., Ltd.* 965 F.Supp. 731, 740 (D.Md. 1997). Judge Motz concluded, "[I]t appears evident that the sort of trespasses to which the [SECA] applies are those in which the trespasser gains access to information to which he is not entitled to see, not those in which the trespasser uses the information in an unauthorized way."  Here, it is abundantly clear from the complaint that Werner-Masuda was authorized to access VLodge and was "entitled to see" all the information stored therein.  *See* Complaint, ¶¶ 16-17.  The legislative history of the SECA also lends support to Werner-Masuda's position.  As Judge Motz explained:

> The Senate Report explaining the statute also supports this reading, giving examples of unauthorized access. The report states, for example, that a subscriber to a computer mail facility would violate the statute by accessing the electronic storage of other subscribers to the facility without specific authorization to do so.

*Id*. at 740 (emphasis added) (citing S.Rep.No. 99-541, at 36 (1986)).  Moreover, the Report provides that § 2701 "addresses the growing problem of unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the

public." S.Rep.No. 99-541, at 35.  Because it is undisputed that Werner-Masuda was authorized to access VLodge, Plaintiff cannot state a claim for relief under the SECA.  Plaintiff does not allege, nor could it, that Werner-Masuda was a "hacker" or "outsider" who, without authorization, gained access to the information contained in VLodge.  The complaint explicitly states that Werner-Masuda was authorized to access not only VLodge, but the membership list contained therein.  *See* Complaint, ¶ 17. There are no allegations to suggest that at the time she was accessing that information, allegedly in violation of her Registration Agreement, her authorization had been revoked.

Plaintiff cites one case, *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868 (9th Cir. 2002), in support of its SECA claim.  *See* (paper 2) (Memorandum in Support of Motion for TRO); (paper 53, at 5).  However, in that case, Davis, the person who allegedly accessed without authorization the private website, gained access by using a password provided to him by one who was authorized. *Id.* at 875-76.  The plaintiff, however, had not authorized Davis's use.  Further, and perhaps most importantly, the court accepted the parties stipulation that Davis's conduct constituted "access without authorization."  *Id.* at 879.  Thus, *Konop* does not support Plaintiff's SECA claim.  Moreover, § 2701(a)(2)'s provision prohibiting one from "intentionally exceed[ing] an

39

authorization to access" protected information is also not applicable. That provision "anticipates that a person with authorization to a computer database or certain public portions of a database is not thereby authorized to visit 'private' zones of data in the system." *Sherman*, 94 F.Supp.2d at 821. Judge Motz' reading of the legislative history in *Educational Testing Service* similarly supports this view. *Educ. Testing Serv.*, 965 F.Supp. at 740 ("[A] member of the general public authorized to access the public portion of a computer facility would violate the statute by exceeding this authorization and accessing the private portions of the facility.") (citing S.Rep.No. 99-541, at 36). Because Plaintiff alleges that Werner-Masuda was authorized to access VLodge in its entirety, including all the information contained therein, she did not exceed her authorization as contemplated under the SECA.

Finally, Plaintiff argues that, although Werner-Masuda was authorized to access VLodge by virtue of her position as an officer of IAM, her authorization was limited by the Registration Agreement she signed. It alleges that by signing the Agreement, Werner-Masuda "committed herself not to access or use VLodge for purposes 'contrary to the policies and procedures of the [IAM] Constitution.'" Complaint, ¶ 30, Ex. A. It argues that when she began to access VLodge for the purpose of verifying or obtaining

address information for UIFA, she was doing so for purposes other than "legitimate IAM business," and, thus, was accessing VLodge either without authorization or in excess of her authorization.

Plaintiff's position is flawed for several reasons.  First, Judge Motz addressed a similar argument in *Educational Testing Service*.  In that case, the plaintiff argued that the defendant violated the SECA by "exceeding the authorization embodied in the confidentiality statements when it copied and disclosed the GRE-CAT questions.  By disregarding the terms of the statements, [the plaintiff] claim[ed], [the defendant's] employees exceeded the conditional access granted by ETS, turning the employees into 'electronic trespassers' whose conduct is covered by the Act." 965 F.Supp. at 740.  Judge Motz rejected this argument, finding that even if the confidentiality statements were violated, the violation resulted from the unauthorized use of the information, not from exceeding any "conditional access" in violation of the SECA.  *Id*.  Moreover, although Congress did not define the phrase "without authorization" in either the SECA or the CFAA, it did provide a statutory definition for the phrase "exceeds authorized access" in the CFAA.  The term "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser

41

is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). It is undisputed Werner-Masuda was authorized to access VLodge, and to use such access to obtain the information on the membership list. Thus, under the plain language of the statute, she did not exceed her authorized access by accessing and/or obtaining Plaintiff's membership information.

Contrary to Plaintiff's assertion regarding the effect of the Registration Agreement on Werner-Masuda's authority to access VLodge, the Agreement states clearly that "[b]y signing this agreement, [she] agree[d] *not to use the information* provided through VLodge for any purpose that would be contrary to the policies and procedures established by the Constitution of the Grand Lodge of the International Association of Machinists and Aerospace Workers." *See* Complaint, Ex. A (emphasis added).[10] Thus, to the extent that Werner-Masuda may have breached the Registration Agreement by *using* the information obtained for purposes contrary to the policies established by the IAM Constitution, it does not follow, as a matter of law, that she was not authorized to access the information, or that she did so

_____

[10] Because the Registration Agreement was referred to in, and attached to, the complaint, the court may consider it when deciding this 12(b)(6) motion without converting it to one for summary judgment. *Abadian v. Lee*, 117 F.Supp.2d 481, 485 (D.Md. 2000).

in excess of her authorization in violation of the SECA or the CFAA. *But see Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F.Supp.2d 1121, 1125 (W.D.Wash. 2000) (relying on the Restatement (Second) of Agency[11] to find that "the authority of the plaintiff's former employees ended when they allegedly became agents of the defendant," and thus, that the employees "lost their authorization and were 'without authorization' [under the CFAA] when they allegedly obtained and sent [the plaintiff's] proprietary information to the defendant via e-mail"). Although Plaintiff may characterize it as so, the gravamen of its complaint is not so much that Werner-Masuda improperly accessed the information contained in VLodge, but rather what she did with the information once she obtained it. The SECA and the CFAA, however, do not prohibit the unauthorized disclosure or use of information, but rather unauthorized access. Nor do their terms proscribe authorized access for unauthorized or illegitimate purposes.[12]

---

[11] Under the Restatement (Second) of Agency, "Unless otherwise agreed, the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal." Restatement (Second) of Agency § 112 (1958).

[12] Perhaps best illustrating this point is the fact that in 1986 Congress amended the CFAA to substitute the phrase "exceeds authorized access" for the phrase "or having accessed a computer
(continued...)

Recognizing that *Shurgard* provides Plaintiff some support for a broader interpretation of these statutes, the court, nevertheless, concludes that in light of the more persuasive statutory interpretations discussed above, the legislative history, and the fact that the SECA and the CFAA are primarily criminal statutes, and, thus, should be construed narrowly, it is beyond doubt that Plaintiff can prove no set of facts that would entitle it to relief under either the SECA or the CFAA. Plaintiff simply cannot overcome the fact, supported by its own allegations, that Werner-Masuda was authorized to access the information contained in VLodge, and that at the time she was allegedly accessing it on behalf of UIFA, her access had not been revoked. Accordingly, the motion to dismiss counts I and II for failure to state a claim will be granted.

### C.   *Supplemental Jurisdiction*

---

[12](...continued)
with authorization, uses the opportunity such access provides for purposes to which such authorization does not extend." S.Rep.No. 99-432, at 9. By enacting this amendment, and providing an express definition for "exceeds authorized access," the intent was to "eliminate coverage for authorized access that aims at 'purposes to which such authorization does not extend,'" thereby "remov[ing] from the sweep of the statute one of the murkier grounds of liability, under which a [person's] access to computerized data might be legitimate in some circumstances, but criminal in other (not clearly distinguishable) circumstances that might be held to exceed his authorization." S.Rep.No. 99-432, at 21.

Under 28 U.S.C. § 1367(c)(3), the court has discretion to decline exercising supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction . . . ." *See Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County, Maryland*, 256 F.Supp.2d 385, 400-01 (D.Md. 2003). In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." The *Gibbs* Court went on to say that "if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.; see also Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) ("[W]e conclude that under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case or, in cases removed from State court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met.").

Because the court will dismiss the claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims.

45

This seems especially appropriate given the somewhat novel and complex issues regarding whether Maryland's long-arm statute permits the exercise of personal jurisdiction over MAG under a conspiracy theory,[13] and whether Plaintiff's membership list would constitute a "trade secret" under Maryland's Uniform Trade Secret Act.  Accordingly, Plaintiff's remaining state law claims will be dismissed without prejudice.

---

[13] As stated at the outset, this court does not reach the issue and expresses no opinion as to its proper resolution.

## VI.  Conclusion

For the reasons stated above, Defendant MAG's motion to dismiss for lack of subject matter jurisdiction will be denied, but Defendant Werner-Masuda's motion on behalf of herself and UIFA to dismiss count I (Stored Electronic Communications Act) and count II (Computer Fraud and Abuse Act) will be granted. With respect to the remaining state law claims, the court declines to exercise supplemental jurisdiction and will dismiss those claims without prejudice.  The motion to seal will be granted, the motion for leave to file a response on the sanctions objections will be granted, and the sanctions imposed by Magistrate Magistrate Judge Day will be modified in part.  The other motions will be denied without prejudice as moot. A separate Order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

September 16, 2005